IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JULY CITCHEU AND CHRISTELLE LAURE TIENTCHEU, on behalf of the ESTATE OF FRANCK SAPPI TCHOUALACK-JOUGOUM and FRANCK SAPPI TCHOUALACK-JOUGOUM'S heir(s)-at-law | § | No. 1:25-cv-01442-DAE |
| *Plaintiffs*, | § | |
| v. | § | |
| TRAVIS COUNTY, TEXAS, TRAVIS COUNTY SHERIFF SALLY HERNANDEZ in her individual and official capacity, and ALEXANDER MEAGHER MD, in his individual and official capacity, | § | |
| *Defendants*. | | |

OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

Before the Court is (1) Defendant Travis County, Texas's ("Travis County"), Travis County Sheriff Sally Hernandez's ("Sheriff Hernandez") and Dr. Alexander Meagher's ("Dr. Meagher") joint Motion to Dismiss (Dkt. # 13) July Citcheu's and Christelle Laure Tientcheu's ("Plaintiffs") First Amended Complaint ("Complaint") (Dkt. # 2). Plaintiffs seek relief on behalf of the Estate of Franck Sappi Tchoualack-Jougoum ("Decedent") and Franck Sappi Tchoualack-Jougom's Heirs at Law. The Court finds the matter suitable for

disposition without a hearing. After careful consideration of the filings and relevant case law, the Court, for the following reasons, **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 13).

## BACKGROUND

### I. Factual Allegations

This case arises out of the September 2023 death of Mr. Franck Sappi Tchoualack-Jougoum. Plaintiffs allege that Decedent had been held in pretrial detention at Travis County Jail ("TCJ") immediately before his death at a local hospital. (Dkt. # 2 at ¶ 8.) Plaintiffs are Decedent's surviving spouse and mother. (Id. at ¶ 1.) In addition to Travis County, Plaintiffs bring claims against the Travis County Sheriff, Sally Hernandez, and TCJ's attending physician, Dr. Alexander Meagher, in their personal and official capacities. (See id. at ¶¶ 2–5.)

Plaintiffs allege that, when Decedent was booked into TCJ on or about September 2, 2023, Defendants observed Decedent "displaying severe mental and physical distress." (Id. at ¶ 8.) From his arrival at TCJ on September 2 until his hospitalization on September 8, 2023, Plaintiffs allege that Decedent presented "clear signs of severe mental decompensation, including bizarre behavior, refusal to engage, self-neglect, and unhygienic conditions," but "Travis County's jailers, medical staff, and mental health personnel failed to provide adequate monitoring, medical care, mental health intervention, or emergency treatment." (Id. at ¶ 11.) Plaintiffs posit a timeline of events across

the relevant period (i.e., from September 2 to September 8) that traces Decedent's precipitous decline in TCJ's custody. (Id. at ¶¶ 12a–l.)

First, upon Decedent's arrival, Plaintiffs claim that TCJ staff made entries in Decedent's file documenting his "mood swings, isolation, neglect of self-care, poor daily living skills, history of substance use, first time in jail, impulsivity, and potential homelessness upon release." (Id. at ¶ 12b). TCJ medical staff noted as early as September 3 that Decedent was "not able to understand and [could] not agree to refrain from harmful action." (Dkt. # 2-1 at 6.) Decedent's file also reflects that TCJ staff characterized him on September 3 as presenting "Severe Suicide Risk," which TCJ defined as "[c]urrent suicide attempts or ideations with inability to ensure safety." (Id.) On the same date that TCJ classified Decedent as a "Severe Suicide Risk," Plaintiffs allege that Defendants "observed escalating maladaptive behaviors but failed to force intervention, provide hydration, or transfer decedent to a medical facility." (Id. at ¶ 12c.)[1]

On September 4, Plaintiffs assert that Decedent continued in the same mental and physical state that Defendants had recorded on September 3,

---

[1] Plaintiffs allege that, on the same report noting Decedent's "clear signs of decompensation," TCJ's "Mental Health staff note[d] 'No indication of mental neurodevelopmental or neurocognitive disorder requiring jail treatment at this time.'" (Dkt. # 2 at ¶ 12c.) The Court notes this incongruity.

yet "[TCJ] staff continued routine monitoring without escalating to emergency care, [which] allow[ed Decedent's] further deterioration." (Id. at ¶ 12d.)

Then, on September 5, Plaintiffs allege that Defendants noted in Decedent's file that he "only ask[ed] for water, no matter what question was asked" and that Defendants shut off the water to his cell "due to flooding." (Id. at ¶ 12e.) At this point, Plaintiffs contend, Defendants continued to deny Decedent access to water and, alternatively, did not "administer forced medication, hydration or hospital transfer." (Id.).

On September 6, Plaintiffs charge that TCJ staff observed Decedent in his cell and "observed feces smeared on the floor, walls, and window," noticed "torn paper and food littering the cell," and saw "Decedent lying near the door, refusing to engage." (Id. at ¶ 12f.) This, Plaintiffs plead, presented "obvious signs of severe neglect and potential dehydration." (Id.) Still, Plaintiffs aver that TCJ staff neither "immediately clean[ed Decedent's] cell, provide[d] medical aid, [n]or hospitalize[d] him." (Id.) Rather, TCJ staff "schedul[ed] a follow-up for the next day." (Id.)

Then, on September 7, Plaintiffs allege that TCJ staff first observed Decedent asleep but neither "check[ed his] hydration [n]or forced nutrition." (Id. at ¶ 12g.) Later, still on September 7, "[o]fficers reported [Decedent] 'covered in feces' for hours, with feces smeared on the window." (Id.) Plaintiffs charge that "[a]t this stage, Decedent's incoherent responses, feces-covered body, and visible decompensation reflected a medical crisis so severe

that any reasonable officer would have recognized that [Decedent's] death or serious bodily injury was highly probable." (Id.) They further allege that Defendants did nothing else to assist Decedent that day. (See id.)

The next day, September 8, Plaintiffs allege that Decedent ate a meal and drank water. (Id. at ¶ 12i.) Later, still on September 8, Plaintiffs claim that Defendants again found "Decedent's cell . . . in disarray with feces smeared everywhere." (Id. at ¶ 12j; Dkt. #2-1 at 3.) After "[h]e refused engagement and appeared decompensated" to TCJ staff, Plaintiffs allege that "[s]upervision approvals were noted, but no emergency action was taken" vis-à-vis Decedent. (Dkt. # 2 at ¶ 12j; Dkt. #2-1 at 3.) Then, and still on September 8, Plaintiffs allege that "[a]t approximately 9:30 PM, Decedent was found on [his cell] floor, unresponsive, with multiple open wounds, cold and clammy skin, breathing but not responding." (Dkt. # 2 at ¶¶12j; see also Dkt. #2-1 at 2 (requesting off-site emergency treatment, and reflecting the same description of Decedent's conditions).)

II. Legal Allegations

Plaintiffs begin by pleading a Monell claim against Travis County under 42 U.S.C. § 1983. (Id. at ¶¶ 20, 20a–c.) They claim that Monell entitles them to relief via each of its three available pathways: (1) an official policy or decision by policymakers; (2) a persistent, widespread practice so common as to constitute a custom; or (3) a failure to train or supervise employees that amounts to deliberate indifference. (Id. at ¶ 20.) At the outset, Plaintiffs allege that

Travis County violated Decedent's "Constitutional rights" by failing to provide him: "(1) reasonable mental and medical health care; (2) protection from harm; (3) an environment free from arbitrary, unjust, cruel, unusual and unconstitutional punishment of a pre-trial detainee." (Id. at ¶ 17 (footnotes omitted).)

First, Plaintiffs allege that "TCJ maintained written and unwritten policies of delaying or denying hospital transfer and [forced] hydration for detainees in crisis." (Id. at ¶ 20a.) Second, they plead an unwritten custom of "[TCJ] staff routinely ignor[ing] obvious medical emergencies, leaving detainees without basic care," which, in their words, "reflect[s] a custom so widespread as to have the force of law." (Id. at ¶ 20b.) And, third, they plead that "Travis County failed to train jailers and medical staff to recognize and respond to life-threatening conditions, despite repeated evidence of detainee deaths and injuries from neglect." (Id. at ¶ 20c.)[2]

To establish Travis County's policies, customs, and practices that "created a substantial risk of serious harm and death" to pretrial detainees *before* Decedent's death in September 2023, Plaintiffs enumerate ten pretrial detainees whom they claim died either in Travis County's custody at TCJ or after being

---

[2] On their third Monell theory, Plaintiffs allege that Sheriff Hernandez "was involved at every level of setting policy and custom, and [Sheriff Hernandez's] failure to adequately train her staff was a direct causal factor leading to Decedent's . . . death." (Id. at ¶ 20c.)

transferred from TCJ to an emergency medical facility. (Id. at ¶¶ 19, 19a–j.) Plaintiffs incorporate by reference news articles discussing these incidents and citing official investigations that were scheduled to be undertaken afterward by Travis County and other state and local authorities. (See id. at 19a–j & nn.4–13.) "[U]pon information and belief," Plaintiffs contend, "in the five years preceding Decedent's death, multiple detainees at TCJ have died or suffered serious injury due to similar failures to provide adequate medical care and hydration." (Id. at ¶ 19.)

Plaintiffs assert claims against Travis County—but neither Dr. Meagher nor Sheriff Hernandez—pursuant to the Texas Wrongful Death Act and Texas Survival Statute for wrongful death and survival damages. (Id. at ¶ 9.)

Next, plaintiffs seek relief under § 1983 against Dr. Alexander Meagher and Sheriff Hernandez in their individual capacities. Plaintiffs allege that Dr. Meagher was "the attending physician to Decedent at all relevant times discussed in th[e Complaint]" (id. at ¶ 3), and that "Sheriff Hernandez is the current Sheriff of Travis County and was the Sheriff at all relevant times discussed in th[e Complaint]." (Id.) This includes the interval during which, per the Plaintiffs' allegations, at least ten pretrial detainees died during their time in TCJ custody across a five-year period before Decedent's September 2023 death. (See supra.)

As to Dr. Meagher, Plaintiffs assert that "[he] exhibited objectively unreasonable disregard for the Decedent's serious medical needs" and either "knew, or should have known, of the Decedent's . . . severe dehydration, malnutrition and incoherence." (Id. at ¶ 27.) Dr. Meagher's "fail[ure] to take reasonable measures to ensure the Decedent received necessary medical intervention, hydration, nutrition, and timely transfer to a hospital," Plaintiffs allege, render him personally liable under § 1983. (Id.; id. at ¶¶ 28–29.) Alternatively, Plaintiffs allege that Dr. Meagher's conduct exposes him to personal liability for "negligence and gross negligence under Texas law." (Id. at ¶ 30.)

As to Sheriff Hernandez, Plaintiffs disclaim that "[h]er liability arises . . . from the acts of her subordinates" at TCJ. (Id. at ¶ 31.) Instead, they charge that she engaged in "objectively unreasonable conduct and [made] conscious choices as the final policymaker and chief supervisor for the Travis County Jail." (Id.) They continue to outline details that, they allege, constitute a "persistent pattern of constitutional violations" and, by dint of her position as the supervisor of TCJ, "provided Sheriff Hernandez with actual knowledge" of the "deficiency in her staff's training and the Jail's operative policies" such that "any reasonable sheriff in her position would have appreciated the high degree of risk [to pretrial detainees] in maintaining the status quo." (Id.) Plaintiffs' Complaint does not expressly request relief under a Texas state law cause of action against Sheriff Hernandez. (See generally Dkt. # 2.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint for "failure to state a claim upon which relief can be granted." When analyzing a motion to dismiss for failure to state a claim, the court "accept[s] 'all well pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" United States ex rel. Vavra v. Kellogg Brown & Root, Inc., 727 F.3d 343, 346 (5th Cir. 2013) (quoting In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)). The court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Funk v. Stryker Corp., 631 F.3d 777, 783 (5th Cir. 2011) (quoting Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007)).

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

A complaint need not include detailed facts to survive a Rule 12(b)(6) motion to dismiss. See Twombly, 550 U.S. at 555–56; cf., e.g., Lowy v. Daniel Def., LLC, 167 F.4th 175, 193 (4th Cir. 2026) ("Plaintiffs are not

required to prove their case in the complaint.") (citation modified). In providing grounds for relief, however, a plaintiff must do more than recite the formulaic elements of a cause of action. See Twombly, 550 U.S. at 556–57. "The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678 (internal quotations and citations omitted). Thus, although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." Tuchman v. DSC Commc'ns Corp., 14 F.3d 1061, 1067 (5th Cir. 1994); see also Plotkin v. IP Axess Inc., 407 F.3d 690, 696 (5th Cir. 2005) ("We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.").

When a complaint fails to adequately state a claim, such deficiency should be "exposed at the point of minimum expenditure of time and money by the parties and the court." Twombly, 550 U.S. at 558 (citation omitted). However, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice. Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co., 313 F.3d 305, 329 (5th Cir. 2002).

## DISCUSSION

Plaintiffs bring causes of action under 42 U.S.C. § 1983 and Texas state law. They advance legal theories that Defendant Travis County's policies

and/or procedures, as well as Defendants Hernandez's and Meagher's conduct, violated "Decedent's Fourteenth Amendment due process rights to reasonable medical and mental health care, protection from harm, and freedom from punishment as a pretrial detainee." (Dkt. # 2 at ¶ 9.)[3] The State claims stem from the same alleged conduct and thus invoke the Court's supplemental subject matter jurisdiction. See 28 U.S.C. § 1367(a). All the defendants have moved to dismiss the various claims against them. (See Dkt.# 13.) The Court will analyze each defendant and their respective arguments about the Plaintiffs' Complaint in turn, beginning with Travis County.

## I. Travis County

In its Motion to Dismiss, Travis County argues that: (1) Plaintiffs' § 1983 Monell claim against the county *and* official capacity claims against Sheriff Hernandez and Dr. Meagher fail because they do not state a claim; (2) their negligence and gross negligence claims fail under Texas state law as to all Defendants because the Texas Tort Claims Act's limited waiver of sovereign immunity does not cover them; (3) and their individual capacity claims against

[3] At the outset, the Court notes that Plaintiffs (respectively, the surviving spouse and mother of decedent), have standing to assert causes of action under § 1983 and the Texas Wrongful Death and Survival Statutes on his behalf. See, e.g, Salinas v. City of Houston, 138 F.4th 822, 829 (5th Cir. 2025) (holding that "as the surviving spouse of [Decedent], [Plaintiff] has sufficiently pleaded facts to establish standing to sue under the Texas Wrongful Death Statute, which provides a cause of action for the benefit of the surviving spouse, children, and parents of the deceased." (citing Tex. Civ. Prac. & Rem. Code § 71.004(a) (footnote omitted)).

Sheriff Hernandez and Dr. Meagher are barred by qualified immunity. (Id.) The Court addresses these arguments in the context of each of Plaintiffs' claims.

A. 42 U.S.C. § 1983 Claims

Section 1983 provides, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." 42 U.S.C. § 1983. In Monell v. Department of Social Services of the City of New York, the Supreme Court held that a municipality cannot face liability under § 1983 *unless* "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." 436 U.S. 658, 694 (1978). In other words, "[a] plaintiff may not recover against a municipality via theories of respondeat superior—the municipality itself must be responsible for the constitutional violation." Martinez v. Nueces Cnty., 71 F.4th 385, 389 (5th Cir. 2023). Rather, the successful plaintiff is one who pleads "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." Id. (quoting Pineda v. City of Houston, 291 F.3d 325, 328 (5th Cir. 2002) (internal citation omitted).

"A policy or custom may be attributed to a municipal defendant through the identification of a final policymaking authority." Garza v. City of Donna, 922 F.3d 626, 637 (5th Cir. 2019) (first citing Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown, 520 U.S. 397, 407 (1997); and then citing City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988)). "Identification of an official as a final policymaking authority is a question of state and local law." Praprotnik, 485 U.S. at 124.

In Thompson v. McGehee, the Fifth Circuit recently clarified that "[t]o survive a motion to dismiss on Monell claims against a municipality, a plaintiff need only allege facts that show an official policy, promulgated or ratified by the policymaker, under which the municipality is said to be liable." Thompson v. McGehee, --F.4th --, 2026 WL 2069890, at *10 (5th Cir. July 17, 2026). "[M]unicipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." Zarnow v. City of Wichita Falls, 614 F.3d 161, 166 (5th Cir. 2010). Additionally, "[t]o proceed beyond the pleading stage, a complaint's description of a policy or custom and its relationship to the underlying constitutional violation cannot be conclusory; it must contain specific facts." Thompson, --F.4th --, 2026 WL 2069890, at *10 (citation modified); see also Liggins v. Duncanville, 52 F.4th 953, 956 (5th Cir. 2022) ("[B]ald factual assertions coupled with informational literature isn't enough to support a [Monell] deliberate indifference claim—even under Rule 12(b)(6)."). And, lastly, "[i]n

considering a Rule 12(b)(6) Motion to Dismiss, the Court can consider 'any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.'" Eachus v. Steelman, No. 4:20-CV-00324, 2021 WL 857988, at *19 (E.D. Tex. Mar. 8, 2021) (quoting Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, 594 F.3d 383, 387 (5th Cir. 2010))); see also Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000) (acknowledging that a district court may consider only the literal contents of the pleadings "as well as attachments thereto" at the 12(b)(6) stage).[4]

When attributing violations of pretrial detainees' rights to municipalities, the cause of those violations is characterized either as a condition of confinement or as an episodic act or omission. Garza, 922 F.3d at 632 (citing Hare v. City of Corinth, 74 F.3d 633, 644 (5th Cir. 1996) (en banc)).

---

[4] Although the Court is unaware of a Fifth Circuit case directly on point in the Monell context, persuasive authorities from other circuits indicate that a plaintiff may, incorporate by reference materials in her complaint that document a policy or custom sanctioning violations of pretrial detainees' rights with embedded links to news articles detailing past violations and/or related litigation. See, e.g., Codrington v. Dolak, 142 F.4th 884, 892 (6th Cir. 2025) (crediting "news articles" referenced in the plaintiff's complaint bringing Monell claim to establish the defendant's "constructive knowledge of the alleged racist practices of [the police department for which he worked] more than one year before [plaintiff] filed suit" (citation modified)); Est. of Roman v. City of Newark, 914 F.3d 789, 799–800 (3d Cir. 2019) (holding that a news article and press release hyperlinked in a plaintiff's complaint were sufficient, when viewed in conjunction with the four corners plaintiff's complaint, to plead a Monell § 1983 claim as well as "failure-to-train, failure-to-supervise, and failure-to-discipline claim[s]").

"Cases of the former are attacks on "general conditions, practices, rules, or restrictions of pretrial confinement." Id. (citation modified). "In cases of the latter, 'the complained-of harm is a particular act or omission of one or more officials,' and 'an actor usually is interposed between the detainee and the municipality.'" Id. (quoting Scott v. Moore, 114 F.3d 51, 53 (5th Cir. 1997) (en banc)).

Plaintiffs' claims against Travis County constitute an episodic act or omission rather than a conditions claim. Cf. id. Although they certainly implicate the conditions in which Decedent was allegedly kept—*i.e.*, a squalid, feces-covered cell and a carceral environment in which he could create open wounds him and generally inflict harm upon himself, even after TCJ medical personnel identified him as a "Severe Suicide Risk"—Plaintiffs Monell claims sound in the realm of episodic acts. (See Dkts. ## 2 at ¶¶ 19–21; 2-1.) Thus, to survive the instant Motion to Dismiss for failure to state a claim, Plaintiffs must have pled that "(1) the [Travis County employee] violated the [Decedent's, a] pretrial detainee's clearly established constitutional rights with subjective deliberate indifference; and (2) that this violation resulted from a [Travis County] policy or custom adopted and maintained with deliberate indifference." Garza, 922 F.3d at 634 (quoting Brumfield v. Hollins, 551 F.3d 322, 331 (5th Cir. 2008)). The Court recognizes that Garza controls here. In Garza, the Fifth Circuit clarified that a municipal employee need not have had "subjective intention" for § 1983 liability to lie against the municipality. See id. at 635–36.

Specifically, it noted, "[t]hough 'subjective intention' and its variants have occasionally appeared in our decisions . . . , far more often we adhere to *Farmer*'s formulation: 'the official knows of and disregards an excessive risk to inmate safety.'" Id. (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)).[5] Then, considering a line of fourteen prior Fifth Circuit cases involving municipal liability, "which include[d] en banc decisions two decades apart," the Garza Court concluded that "none requires proof that officials subjectively intend that harm occur." Id. at 636 (footnotes and citations omitted).

Here, Plaintiffs have pleaded "specific facts" that support their claim that, for the five-year period before and including Decedent's death, Travis County maintained an official "policy or custom" that supplied the "moving force" behind the constitutional violations that Defendants' conduct wrought upon Decedent. Thompson, -- F.4th -- 2026 WL 2069890, at *10; (see Dkt. # 2 at ¶ 17.) The list of ten pretrial detainees who allegedly died in custody at TCJ (or immediately upon being transferred to an emergency facility *from* custody at TCJ) (see Dkt. # 2 at 19a–j & nn.4–13) represents the heartland of evidence that the Supreme Court and the Fifth Circuit require parties to plead a Monell claim. See, e.g., Garza, 922 F.3d at 632–36 (detailing the Fifth Circuit's

[5] The Court notes that Plaintiff's briefing assumes the subjective intent standard for Monell claims. (See generally Dkt. # 15.) Nonetheless, the Court must follow and apply the law as it stands—in this case, as clarified in Garza—rather than blindly credit *any* party's legal assertions or conclusions. See Iqbal, 556 U.S. at 678.

requirements). Thompson, --F.4th --, 2026 WL 2069890, at *10; cf. Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678.

And, while the Court recognizes that Plaintiffs' Complaint does not include reference to the specific policies—whether publicly available or otherwise—the Federal Rules of Civil Procedure do not require that Plaintiffs *prove* the elements of their case in their Complaint. See, e.g., Robertson v. Sea Pines Real Est. Cos., Inc., 679 F.3d 278, 291 (4th Cir. 2012) ("The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at [her] disposal at the outset." (citation modified)). Defendants counter that "Plaintiffs have no excuse in alleging that Defendants are not following their own policies" because "Plaintiffs are aware of what the Travis County policies are." (Dkt. # 16 at 3.) This is not a meritorious argument. Even if, as Defendants reference, controlling law requires that counties provide a training program for jail and prison officials that "enable[s] officers to respond properly to the usual and recurring situations with which they must deal," Plaintiffs have met the Iqbal and Twombly standards. That is, they have alleged that Travis County's policies or customs supply the "moving force" behind the constitutional violation that they allege resulted in Decedent's death. (Id. (quoting City of Canton v. Harris, 489 U.S. 378, 391 (1989)); Dkt. # 2 at ¶¶ 6, 13.); cf. Iqbal, 556 U.S. at 678 (holding that a plaintiff's complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged"). In other words, Plaintiffs' Complaint need not amount to a Proustian exegesis. See Twombly, 550 U.S. at 555–56.

Defendants make hay of the fact that the Supreme Court has reaffirmed its "conclusion in Bryan County that a pattern of violations is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." (Dkt. # 13 at 2 (quoting Connick v. Thompson, 563 U.S. 51, 70 (2011) (internal citation omitted).) The Court arrives at the same conclusion as Defendants—"a pattern of violations" is, after all, one of the core legal elements required to state a claim upon which relief can be granted on Plaintiffs' Monell claim. Defendants' briefs, however, merely reiterate the elements that Plaintiffs must plead to state a claim upon which relief can be granted. Cf. Fed. R. Civ. P. 8. Plaintiffs have, in fact, plausibly alleged "specific facts," which include "a pattern of violations" at TCJ resulting in Decedent's and at least ten TCJ pretrial detainees' deaths before him. To be sure, they have stated a viable claim for Monell liability against Travis County. 436 U.S. at 694; see also Thompson, --F.4th --, 2026 WL 2069890, at *10.

Additionally, Plaintiffs' Complaint attributes the alleged policy or custom concerning pretrial detainees at TCJ by identifying Sheriff Gonzalez as the "final policymaker." (Dkt. # 2 at ¶ 31.); see Garza, 922 F.3d at 637. By Defendants' own admission, Sheriff Hernandez is the final policymaker for the county jail. (Dkt. # 13 at 11 (citing Tex. Loc. Gov't Code § 351.041).) It is

immaterial that any policy that the Plaintiffs complained either did or did not receive "formal approval." See Zarnow, 614 F.3d at 166.

B. State Law Claims

1. Negligence and gross negligence

To state a claim for negligence under Texas law, the plaintiff must show (1) a legal duty owed by the defendant to the plaintiff; (2) a breach of the duty; and (3) damages proximately caused by the breach. D. Houston, Inc. v. Love, 92 S.W.3d 450, 454 (Tex. 2002). Gross negligence, on the other hand, requires a showing of: (1) the breach of a duty involving an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (2) that the actor was actually aware of the risk involved, but nevertheless proceeded in conscious indifference to the rights, safety, or welfare of others." Potter v. Cabello, No. 3:19-CV-1330-G, 2019 WL 6173763, at *6 (N.D. Tex. Nov. 19, 2019) (first quoting Cooper v. Bank of N.Y. Mellon, No. 3:13-CV-1985-N-BK, 2014 WL 349577, at *5 (N.D. Tex. Jan. 31, 2014); and then citing Gen. Motors Corp. v. Sanchez, 997 S.W.2d 584, 595 (Tex. 1999)); see also Tex. Civ. Prac. & Rem. Code § 41.001(11) (defining "gross negligence").

Under the doctrine of governmental immunity, Texas law recognizes that "a municipality is immune from tort liability for its own acts or the acts of its agents unless the Texas Tort Claims Act ['TTCA'] waives immunity." Hobart v. City of Stafford, 784 F. Supp. 2d 732, 758 (S.D. Tex. 2011) (quoting City of Amarillo v. Martin, 971 S.W.2d 426, 427 (Tex. 1998)).

In relevant part, § 101.021 of the TTCA waives governmental immunity "to the extent that liability arises from the 'use of a motor-driven vehicle or motor-driven equipment' or from 'a condition or use of tangible personal or real property.'" Mission Consol. Indep. Sch. Dist. v. Garcia, 253 S.W.3d 653, 655–56 (Tex. 2008) (quoting Tex. Civ. Prac. & Rem. Code § 101.021). The TTCA "provides a limited waiver of immunity for certain suits against governmental entities and caps recoverable damages." Id. at 655.

Under its plain language, "the Court must apply § 101.106(f ) when a government employee shows that, at the time the alleged wrongful act or omission occurred: (1) he was an employee of a government unit; (2) his alleged act or omission fell within the scope of his employment; and (3) the suit could have been brought against the government unit under the TTCA." Here, Travis County argues move to dismiss Plaintiffs' claims in their Motion. (See Dkts. # 13.) The Court must thus dismiss the TTCA claims against Travis County. Cf., e.g., Alexander v. Walker, 435 S.W.3d 789, 790–91 (Tex. 2014) ("The plain language of the election-of-remedies provision, then, demonstrates that a suit against the government triggers subsection (a) and bars suit against an employee who has been sued in his individual rather than official capacity." (citing Tex. Civ. Prac. & Rem. Code § 101.106(a)).

2. Wrongful death and survival damages

"The Wrongful Death Act sets forth the circumstances under which a "person" may be liable for an injury that causes an individual's death. Cnty.

of El Paso v. Dorado, 33 S.W.3d 44, 46 (Tex. App.—El Paso 2000, reh'g overruled) (citing Tex. Civ. Prac. & Rem. Code Ann. § 71.002 (Vernon 1997)).[6] "The word 'person' is specifically defined to include an individual, association of individuals, joint-stock company, or corporation or a trustee or receiver of an individual, association of individuals, joint-stock company, or corporation." Id. (citation modified). What is more, "[t]he term 'corporation' is further defined to exclude . . . a county or a common or independent school district." Id. (citation modified). "Thus, the plain wording of the statute makes it clear that [Travis C]ounty may not be sued for wrongful death under the Wrongful Death Act." Id.; accord Hudspeth Cnty. v. Ramirez, 657 S.W.3d 103, 110 (Tex. App.—El Paso 2022, no pet.). Bound as it is by Texas state courts' rules of decision on Texas state law, the Court therefore dismisses Plaintiffs' claims under the Texas wrongful death and survival statutes against Travis County. See Palmquist, 103 F.4th at 306.

## II. Dr. Meagher

### A. Section 1983 Claims for Constitutional Violations

[6] The Court notes that the Texas statute was amended in 2003. It appears to the Court, however, that the 2003 statute retains the same language and, consequently, that the above-cited decision continues to govern how this Court should construe the Texas statute. See Palmquist v. Hain Celestial Grp., Inc., 103 F.4th 294, 306 (5th Cir. 2024), cert. granted in part, 145 S. Ct. 1960 (2025), aff'd and remanded, 607 U.S. 421 (2026).

Because Dr. Meagher asserts qualified immunity, (see Dkt. # 13 at ¶ 20), the Court begins its analysis there. The doctrine of qualified immunity insulates state actors from liability for their wrongful actions "so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Lincoln v. Turner, 874 F.3d 833, 847 (5th Cir. 2017) (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015)).[7] Any defendant's invocation of qualified immunity on a Rule 12(b)(6) motion shifts "the burden to the plaintiff to demonstrate the inapplicability of the defense." Id. (quoting Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 194 (5th Cir. 2009)).

To overcome a defendant's assertion of qualified immunity, the Supreme Court has held that the plaintiff must "show (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established' at the time of the challenged conduct." Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)) (citation modified). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, 577 U.S. at 11–12 (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012) (citation modified)).

[7] At the outset of the qualified immunity analysis, the Court notes that neither the Supreme Court nor the Fifth Circuit requires that a court in this Court's position "limit [its] analysis to the cases cited by Plaintiffs." Joseph on behalf of Est. of Joseph v. Bartlett, 981 F.3d 319, 338 (5th Cir. 2020); Elder v. Holloway, 510 U.S. 510, 516 (1994).

Moreover, "[the Supreme Court] do[es]not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." Id. at 12 (quoting Al-Kidd, 563 U.S. at 741); see Zorn v. Linton, 146 S. Ct. 926, 930 (2026) ("[O]fficers receive qualified immunity unless they could have "read" the relevant precedent beforehand and "known" that it proscribed their specific conduct." (quoting City & Cnty. of San Francisco v. Sheehan, 575 U.S. 600, 616 (2015))) (citation modified). And, finally, the Fifth Circuit has construed the Supreme Court's precedents to affirm that "[q]ualified immunity does not operate at a high level of generality" because such a contention would enable plaintiffs "to convert the rule of qualified immunity into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." Lincoln, 874 F.3d at 850 (citation modified).

1. Plaintiffs have Sufficiently Pleaded that Dr. Meagher Violated Decedent's Constitutional Rights

To be sure, "[t]he Eighth Amendment prohibits deliberate indifference to a prisoner's medical needs, while the Fourteenth Amendment['s Due Process Clause] prohibits deliberate indifference to a pretrial detainee's medical needs." Ford v. Anderson Cnty., 102 F.4th 292, 307 n.5 (5th Cir. 2024) (citing Cleveland v. Bell, 938 F.3d 672, 676 (5th Cir. 2019)). The Fifth Circuit recognizes "no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such as medical care." Gibbs v.

Grimmette, 254 F.3d 545, 548 (5th Cir. 2001).[8] Moreover, although the Fifth Circuit recognizes that a plaintiff alleging deliberate indifference need not plead that the decedent was "experiencing an acute medical crisis requiring emergency intervention to be facing a substantial risk of serious harm." Ford, 104 F.4th at 308 n.6. It has also held that dehydration can qualify as "a serious medical issue" for which an official's response with "a cursory level of care may still constitute deliberate indifference." Id. at 308 n.7 (citing Austin v. Johnson, 328 F.3d 204, 210 (5th Cir. 2003), wherein the Fifth Circuit held that "[g]iven the serious medical consequences of dehydration, a reasonable person would not have waited nearly two hours to call an ambulance once [the detainee-decedent] became unconscious").

Defendant Meagher's staff saw Decedent and directed all reports to Decedent's file, which, at all relevant times, indicated that Dr. Meagher was in fact Decedent's *attending physician*. (See Dkt. # 2-1.) As a pretrial detainee, Decedent had Fourteenth Amendment rights *both* to receive adequate medical care and to protection from known suicidal tendencies. See, e.g., Garza, 922 F.3d at 632 (first citing Sanchez v. Young Cnty., 866 F.3d 274, 279 (5th Cir. 2017) (adequate medical care); and then citing Flores v. Cnty. of Hardeman, 124

[8] To be clear, the governing law permits for the denial of certain items. This includes things like "bedding to inmates in isolation in order to prevent the higher risk of inmate suicide." E.g., Phillips v. East, 81 F. App'x 483, 485 (5th Cir. 2003).

F.3d 736, 738 (5th Cir. 1997) (protection from known risk of suicide)). Here, Plaintiffs have pleaded that Decedent was identified as a "Severe Suicide Risk" (on files marking Dr. Meagher as the attending physician) days before his eventual transfer to an off-site emergency medical facility and subsequent death. (See, e.g., Dkt. ## 2 at ¶¶ 12a–l.) Furthermore, Plaintiffs allege that Decedent had been banging his head against the walls days before he was taken off-site for emergency care. (See id.) And, when Decedent was discovered in his cell at 9:30 PM on September 8, 2023, he was found to have "open wounds." (See id. at ¶¶12j.)

In Ford, the Fifth Circuit refused to award summary judgment to a physician who had provided medical care to a pretrial detainee who suffered from Addison's disease and later succumbed to that ailment.[9] 102 F.4th at 308–09.[10] Specifically, it determined that "a genuine dispute of material fact

---

[9] To be sure, the Court is aware that Ford was published *after* the alleged constitutional violations. It references it only illustratively, for the opinion discusses the authorities that both predate Decedent's death and—standing alone—clearly establish the constitutional violations that Plaintiffs alleged Dr. Meagher to have committed. See al-Kidd, 563 U.S. at 735 (holding that the qualified immunity analysis hinges on whether "the right was 'clearly established' *at the time of the challenged conduct*" (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (emphasis added)).

[10] The Court notes that the burden that Federal Rule of Civil Procedure 56 places on nonmovants for summary judgment is *more* exacting than that which Rule 8 places on a plaintiff opposing a motion to dismiss (like Plaintiffs here). Compare Fed. R. Civ. P. 56 (defining the burdens of movants and nonmovants alike), with id. Rule 8 (defining pleading standards), Twombly, Atl. Corp. v. Twombly, 550 U.S. at 570 (construing Rule 8 to require that plaintiffs plead

regarding whether [the jail's doctor] "had subjective knowledge of a substantial risk of serious harm to [the pretrial detainee]." Id. at 308. The Ford Court then reasoned that the decedent pretrial detainee's estate had "also presented a genuine dispute of material fact whether [the doctor's] failure to treat or monitor [decedent's] Addison's disease constituted deliberate indifference." Id. Critically, it distinguished simple "mistreatment" and "negligent treatment decisions" from deliberate indifference. Id. (citing Gobert v. Caldwell, 463 F.3d 339, 346 (5th Cir. 2006)). In Gobert, the Fifth Circuit clarified that on summary judgment—which, again, the Court notes presents a more trying standard for Plaintiffs to meet[11]—Plaintiffs' claims will survive if they create a fact issue over whether "[jail] officials 'refused to treat [Decedent], ignored his complaints, intentionally treated him incorrectly, *or* engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" Gobert, 463 F.3d at 346 (quoting Domino v. Tex. Dep't of Crim. Just., 239 F.3d 752, 756 (5th Cir.2001) (internal citation omitted)). By extension to the instant motion to dismiss context, Plaintiffs need only plead factually plausible claims that Dr. Meagher, as Decedent's attending physician, violated

---

"enough facts to state a claim to relief that is plausible on its face"), and Iqbal, 556 U.S. at 678 (similar, observing that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

[11] This observation is by no means an attempt to predict the outcome of a motion for summary judgment, should any of the parties file one.

Decedent's Fourteenth Amendment rights. See, e.g., Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678. The Court holds that they have done so.

Because the Court concludes that Plaintiffs pleaded plausible facts which support that Dr. Meagher's conduct violated Decedent's Fourteenth Amendment rights in pretrial detention, it proceeds to the analysis of whether those rights were clearly established. See, e.g., Pearson v. Callahan, 555 U.S. 223, 236 (2009) (allowing district courts "to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first").

2. Decedent's Constitutional Rights Were Clearly Established

Plaintiffs identify several authorities that, they posit, demonstrate that Decedent's constitutional rights were clearly established. (See, e.g., Dkt. # 15 at ¶ 24 & nn.17–21.) For example, they assert that the Fourteenth Amendment establishes the right to adequate medical care. (See id.)[12] In

---

[12] The Court notes that Plaintiffs are correct and, insofar as the Court construes the Fifth Circuit's on point rules of decision, the Court may identify relevant law to assure itself of whether the law was, in fact, clearly established. Bartlett, 981 F.3d at 338; see also Holloway, 510 U.S. at 516. Furthermore, the Court observes that Defendants have made no effort in their Reply briefing (Dkt. # 16) to engage with or discern any of the authorities Plaintiffs presented in their Opposition (Dkt. # 15) or, at the outset in their Motion (Dkt. # 13) to explain why the law was not clearly established. To wit, Defendants' Motion at no point uses the term "clearly established" or makes any meaningful argument as to why or how qualified immunity applies to Sheriff Hernandez or Dr. Meagher. (See Dkt. # 13.) Again, while this Court is unaware of any authority that requires a *defendant* asserting qualified immunity to establish any obligation to

support, they cite the Fifth Circuit's 1996 en banc decision in Hare v. City of Corinth. 74 F.3d at 648. Hare reaffirmed the relevance of the Supreme Court's decision in Farmer, wherein the Supreme Court had held that case law concerning the Eighth Amendment rights of convicted defendants also applied pretrial detainees. Id. Specifically, the Hare Court quoted Farmer for the proposition that prison officials have a duty to "ensure that inmates receive adequate food, clothing, shelter and medical care, and to take reasonable measures to guarantee the safety of the inmates." Id. (quoting Farmer, 511 U.S. at 832–33) (citation modified).

Moreover, and before Dr. Meagher's alleged conduct here, the Fifth Circuit has reiterated Hare's continued applicability—further underscoring what the Supreme Court had previously held in cases like Farmer. Namely, it has identified judicial decisions from the Eighth Amendment sphere as establishing a convicted defendant's Eighth Amendment rights to medical care also establish the same right for a pretrial detainee. E.g., Sims v. Griffin, 35 F.4th 945, 951–52 (5th Cir. 2022) (determining that, as of 2006, the Fifth Circuit had clearly established a detainee's Fourteenth Amendment right to medical care while incarcerated (citing Easter v. Powell, 467 F.3d 459 (5th Cir. 2006));

---

identify authorities clearly establishing the law, see Lincoln, 874 F.3d at 847 (noting that the burden rests with the plaintiff opposing a qualified immunity defense), the Court notes threadbare "qualified immunity argument" that Defendants reference in their briefing. (Dkt. # 13 at ¶¶ 20, 23.)

Kelson v. Clark, 1 F.4th 411, 421 (5th Cir. 2021) (collecting Fifth Circuit decisions about convicted defendants' Eighth Amendment rights, including Easter, and holding those cases clearly established a pretrial detainee's Fourteenth Amendment rights to medical care while in detention)). Critically, both cases come from the period *before* Decedent's September 2023 death following his time in pretrial detention at TCJ.

Thus, the Court concludes that the authorities discussed—both Hare (from 1996) and cases of a more recent vintage, like Easter, Clark, and Sims (from 2006, 2021, and 2022, respectively) were clearly established by the time of Decedent's September 2023 death. By virtue of each case, as well as all of them collectively, Dr. Meagher was on notice that a physician in his position charged with providing medical care to pretrial detainees could be liable for violating his pretrial-detainee patients' constitutional right to, *inter alia*, receive adequate medical care and be protected from known suicidal tendencies such that he could be personally liable for failing to protect those rights. The former includes being protected from severe dehydration. See supra (discussing Fifth Circuit authorities); Austin, 328 F.3d at 210.

Accordingly the Court denies the Motion to Dismiss Plaintiffs' claims against Dr. Meagher in his individual capacity. Because the Fifth Circuit treats "[a] claim against an officer in his official capacity . . . as a claim against the municipality," however, the Court dismisses the official capacity claims

against Dr. Meagher as redundant. Jordan v. Brumfield, 687 F. App'x 408 (5th Cir. 2017) (citing Brooks v. George Cnty., 84 F.3d 157, 165 (5th Cir. 1996)).

B. State Law Claims

Particularly salient to this case, § 101.106(e) provides: "If a suit is filed under this chapter against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit." Tex. Civ. Prac. & Rem. Code § 101.106(e) (emphasis added). Such a dismissal "includes the state-law claims asserted against the individual defendants in their official and individual capacities." Degollado v. City of Port Lavaca, No. 6:23-CV-00014, 2025 WL 976603, at *8 (S.D. Tex. Mar. 31, 2025) (emphasis in original); see also A.W. v. Humble Indep. Sch. Dist., 25 F. Supp. 3d 973, 1007 (S.D. Tex. 2014) (similar), aff'd sub nom. King-White v. Humble Indep. Sch. Dist., 803 F.3d 754 (5th Cir. 2015). In light of Travis County's Motion to Dismiss, the Court will dismiss all of Plaintiff's Texas state law claims against Dr. Meagher and Sheriff Hernandez.

III. Sheriff Hernandez

A. 42 U.S.C. § 1983 Claims

Plaintiff asserts § 1983 claims against Sheriff Hernandez in her official capacity and in her individual capacity. (See Dkt. # 2.) The Court reads Plaintiffs' Complaint as asserting *both* a supervisory liability and a failure-to-

train claim against Sheriff Hernandez. (Id. at ¶ 31.)[13] To the extent that Plaintiffs attempt to amend their complaint via their Response in Opposition to Defendants' Motion to Dismiss (Dkt. # 15 at ¶ 6 (asserting a deliberate indifference claim against Sheriff Hernandez)), the Court cannot consider such a claim. E.g., Sheddy v. JPMorgan Chase Bank, N.A., No. 3:12-CV-2804-M-BF, 2013 WL 5450288, at *5 (N.D. Tex. Sept. 30, 2013) ("Plaintiff is not entitled to add new claims to his complaint by way of his response."); St. Paul Ins. Co. of Bellaire. v. AFIA Worldwide Ins. Co., 937 F.2d 274, 279 (5th Cir. 1991) ("A court which considers a motion for a 12(b)(6) . . . dismissal must look only at the pleadings . . . ." (internal citation omitted)).

Like Dr. Meagher, Sheriff Hernandez also asserts qualified immunity. The same rules of qualified immunity that governed the Court's

[13] On the one hand, Plaintiffs allege that Sheriff Hernandez failed to train her the staff at TCJ. (See id. (claiming that Hernandez "deliberate[ly] and objectively unreasonabl[y] refus[ed] to train or supervise her staff in the face of this known, pervasive pattern" of pretrial detainees' deaths at TCJ "was a direct and proximate cause of the Decedent's injuries and death).) On the other, Plaintiffs assert that Sheriff Hernandez bears supervisory liability as the final policymaker responsible for a policy or policies that resulted in repeated violations to TCJ pretrial detainees' constitutional rights—the same that they allege caused Decedent's death. (See id. ("The well-documented pattern of prior, preventable in-custody deaths and serious injuries at the Travis County Jail, detailed in paragraph 19 . . . involved failures nearly identical to those that killed the Decedent: systemic failures to provide hydration, address obvious medical crises, and ensure timely emergency care. This persistent pattern of constitutional violations provided Sheriff Hernandez with actual knowledge of a specific, obvious, and critical deficiency in her staff's training and the Jail's operative policies.").)

analysis of whether Dr. Meagher may be liable to Plaintiffs serves as a gatekeeper of the Court's inquiry into Sheriff Hernandez's potential liability. See supra. Like for Dr. Meagher, Plaintiffs' claims against Sheriff Hernandez may only progress to discovery if they plausibly allege claims that she violated Decedent's constitutional rights *and* that such rights were clearly established at the time of the violation. See al-Kidd, 563 U.S. at 735.

1. Plaintiffs have Sufficiently Pleaded that Sheriff Hernandez Violated Decedent's Constitutional Rights

a. *Supervisory liability*

Supervisors who set municipal policy or custom may face liability on individual capacity claims when "enforcement of a policy or practice results in a deprivation of federally protected rights." Bustos v. Martini Club Inc., 599 F.3d 458, 468 (5th Cir. 2010) (citation omitted). For example, in its 1992 decision in Mouille v. City of Live Oak, Texas, the Fifth Circuit articulated the rule that "[s]upervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivation; or (ii) implement unconstitutional policies that causally result in plaintiff's injury." 977 F.2d 924, 929 (5th Cir. 1992) (citing Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir.1987)); see also Jacobs v. W. Feliciana Sheriff's Dep't, 228 F.3d 388, 395–96 (5th Cir. 2000) (affirming the district court's denial of a sheriff's motion to dismiss individual capacity claims for deliberate indifference even though "[the sheriff] instituted some preventative measures, including not allowing [detainee] to have loose bedding during the first day and a half of her detention and

instituting more frequent checks on her," and reasoning that this did not fulfill "his duty *not to be deliberately indifferent*" (emphasis added)).[14]

In this case, by Defendants' own admission, Sheriff Hernandez is the final policymaker for the county jail. (Dkt. # 13 at 11 (citing Tex. Loc. Gov't Code § 351.041).); cf. Praprotnik, 485 U.S. at 124 (holding that state and local law governs who qualifies as a final policymaker). In other words, she *may* be responsible if she "implement[s] unconstitutional policies that causally result in plaintiff's injury." Mouille, 977 F.2d at 929. Because Plaintiffs have pleaded that the policies that she makes and/or enforces result in a deprivation of federally protected rights," Plaintiffs may have alleged a facially plausible claim supported by "specific facts." Bustos, 599 F.3d at 467; see also Twombly, 550 U.S. at 570; Iqbal, 556 U.S. at 678.

b. *Failure to train*

The Fifth Circuit recognizes that a Sheriff may be liable in her individual capacity for the constitutional violations of a pretrial detainee in

[14] Insofar as the Court is aware, Mouille remains the rule in the Circuit. See, e.g., Martinez v. Harris Cnty., No. 24-20194, 2025 WL 914309, at *7 (5th Cir. Mar. 26, 2025) (unpublished) (relying on Mouille as supplying the rule of decision governing a supervisory officer's liability in their individual capacity). The Fifth Circuit's 2010 decision in Bustos v. Martini Club Inc. reinforces the rule from Mouille, albeit with a different turn of phrase. 599 F.3d at 467. The Bustos Court held that supervisors may face liability on individual capacity claims when "enforcement of a policy or practice results in a deprivation of federally protected rights." Id. (footnotes omitted).

custody at a jail under their command if the Sheriff "(1) failed to supervise or train the subordinate official [responsible for providing care to the Defendant]; a causal link exists between the failure to train or supervise [jail employees] and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." Est. of Davis ex rel. McCully v. City of N. Richland Hills, 406 F.3d 375, 381 (5th Cir.2005) (citation modified); accord Gates v. Tex. Dep't of Protective & Regul. Servs., 537 F.3d 404, 435 (5th Cir. 2008).

On this score, Plaintiffs claim that "Travis County failed to train jailers and medical staff to recognize and respond to life-threatening conditions, despite repeated evidence of detainee deaths and injuries from neglect." (Dkt. # 2 at ¶ 20c.) They also allege that at least ten pretrial detainees died as a result of their confinement at TCJ before Decedent's death, and they claim that these deaths "were the subject of media reports and civil lawsuits, placed Travis County policymakers, including Sheriff Hernandez, on actual notice that their policies and customs were creating a substantial risk of serious harm and death." (Id. at ¶ 19.) More precisely, "[t]he need for corrective action" in the aftermath of the deaths of pretrial detainees, Plaintiffs claim, "including [the need to] implement[] specific training for jailers on recognizing and responding to life-threatening dehydration and medical emergencies [] was so obvious that any reasonable sheriff in her position would have appreciated the high degree of risk involved in maintaining the status quo." (Id. at ¶ 31.) At this stage, these

allegations are enough to sustain the Plaintiffs' claims into the discovery phase. Cf., e.g., Estate of Davis, 406 F.3d at 381; Gates, 537 F.3d at 435.

2. Clearly established

The cases above were decided *before* both Decedent's September 2023 death *and* the inception (five years prior) of the pattern that Plaintiffs allege of pretrial detainees dying at TCJ as a result of Sheriff Hernandez's conduct as TCJ's chief supervisor and policymaker (*i.e.*, the policies and customs she implemented and her failure to train TCJ staff). For instance, Fifth Circuit precedent—precedent that existed well before alleged beginning of the pattern of violations at TCJ that Plaintiffs allege—put Sheriff Hernandez on notice of the personal liability that she could face for overseeing an unconstitutional custom or policy. E.g., Mouille, 977 F.2d at 929; Bustos, 599 F.3d at 467. Therefore, the Court determines that the rules of decision articulated in each case clearly established the constitutional violations that Plaintiffs plead here. Each of these cases detailed violations that would expose a sheriff (like Sheriff Hernandez) who wields supervisory authority over a jail to liability in her individual capacity. See supra. This is so both for (1) policies or customs implemented on her watch and (2) for the failure to train her staff to provide for pretrial detainees' basic human needs such as medical care. See Gibbs, 254 F.3d at 548.

Simply put, a sheriff standing in Sheriff Hernandez's shoes would know from the case discussed above that he or she could face liability if they

acted in the way that Plaintiffs have alleged Sheriff Hernandez did, in fact, act in this case. See Luna, 577 U.S. at 11–12; see also Lincoln, 874 F.3d at 847 (holding that qualified immunity applies *unless* the defendant official "violate[s] constitutional rights of which a reasonable person would have known" (quoting Luna, 577 U.S. at 11)). Although their briefing does not reference all the authorities that the Court discusses herein, the Court notes that Plaintiffs need not do so to overcome a qualified immunity defense. See, e.g., Bartlett, 981 F.3d at 338 (noting that district courts may consider cases beyond "the cases cited by Plaintiffs"); cf. Holloway, 510 U.S. at 516 (similar).

Thus, because Sheriff Hernandez's conduct, as pleaded, violated Decedent's clearly established rights, the Court thus denies Sheriff Hernandez's Motion to Dismiss the claims against her in her individual capacity. And, for the same reasons that the Court dismissed Plaintiff's official capacity claims against Dr. Meagher, see supra, the Court concludes that it must also the official capacity claims against Sheriff Hernandez as redundant.

B. State Law Claims

For the reasons discussed above, the Court dismisses the state law claims against Sheriff Hernandez. See supra (discussing governmental immunity under the TTCA and noting that it applies to both Dr. Meagher and Sheriff Hernandez); cf. Trevino, 2011 WL 13234716, at *6 (applying the TTCA in similar circumstances).

## CONCLUSION

For the reasons above, Defendants Travis County's, Sheriff Hernandez's, and Dr. Meagher's Motion to Dismiss (Dkt. # 13) is **GRANTED IN PART AND DENIED IN PART**. It is **GRANTED** with respect to Plaintiffs' claims arising under Texas law. Those are **DISMISSED WITHOUT PREJUDICE**. However, Defendants' Motion is **DENIED** with respect to Plaintiffs' § 1983 claims as to all Defendants. The Court will issue a separate order for the parties' **joint scheduling recommendations on or before September 21, 2026.**

**IT IS SO ORDERED.**

**DATED**: Austin, Texas, August 21, 2026.

______________________________________

David Alan Ezra
Senior United States District Judge